RECEIVED

*DEC 0 9 2013*

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAFAYETTE  DIVISION**

| | |
|---|---|
| Mason, et al | Civil Action No. 12-2939 |
| versus | Judge Richard T. Haik |
| City of Lafayette, et al | Magistrate Judge C. Michael Hill |

### MEMORANDUM RULING

Before the Court is a  Motion for Summary Judgment filed by defendants,

Lafayette City-Parish Consolidated Government ("LCG"), Chief James P. Craft, in

his Official Capacity as Chief of Police of LCG, and Officer Martin Faul, Individually

and  in  his  Official  Capacity  as  a  Police  Officer  of  LCG  [Rec.  Doc.  44],  a

Memorandum in Opposition filed by plaintiffs, Brenda Mason and Billy C. Mason,

individually and on behalf of their deceased son, Quamaine Dwayne Mason, [Rec.

Doc. 60] and Defendants' Reply thereto [Rec. Doc. 65].  For the following reasons,

the motion for summary judgment will be granted.

### I. Background

On December 9, 2011, 911 Dispatch received an open line phone call from

Jeremy Richardson in which a heated verbal altercation was in the process of taking

place.  *R. 44, Exh. A, 911 recording.*  After approximately one minute of the 911

Dispatcher hearing only a loud and intense argument, Richardson told the Dispatcher

he was inside an apartment at Campus Crossing in Lafayette when "a guy busted in my cousin's girlfriend's room," "he has a gun with him" and "he wanted his dog." *Id.* The 911 Dispatcher immediately transferred the call to a LCG Police Department[1] Dispatcher. *Id.*

Richardson advised the Police Dispatcher that Quamaine Dwayne Mason ("Mason"), who he only knew as "D", broke into apartment 712 of Campus Crossing Apartments and had a gun with him, that Mason was trying to get his dog from a girl in the apartment, that Mason busted through the door when it was opened to give him the dog, and that Mason was still in the apartment with the girl, later identified as Racquel Babino, Mason's girl friend.[2] *Id.* Richardson also provided a physical description of Mason and his clothing. *Id.* The Police Dispatch radioed for responding officers indicating a"65G" In Progress (Armed Robbery in Progress) and the physical description of Mason provided by Richardson. *Id.* The Dispatcher told Richardson to go speak with the officers when they arrived. *Id.*

LCG Police Officers Martin Faul, Brittney Dugas and Jace Galland arrived first on the scene and met with Richardson and Pitkins in the parking lot of the apartment

---

[1] The LCG Police Department is sometimes referred to as "Lafayette Police Department."

[2] Datrenie King, who was also in the apartment at the time of the incident, stated that Mason entered the apartment uninvited and began banging on his girl friend's bedroom door and trying to open the door with a knife because he believed someone was in the room with her. Mason stated "Man if somebody in there, I'm going to pistol whip them." *R. 44, Exh. B.*

complex. Officer Faul, a canine officer, had his dog with him that night.  The following facts are taken from the Louisiana State Police Investigations interviews of Faul, Dugas and Galland and, unless otherwise indicated, represent the uncontroverted facts as provided by the officers statements.  *R. 44, Exhs. G, H, I.*

The Police Dispatcher called for respondents to an armed robbery at 200 Theater, Campus Crossing apartments by a Black male with a gun wearing black pants and black shirt who was still in apartment 712.  Officers Faul, Dugas and Galland first arrived on the scene  and were flagged down by Richardson and Pitre, who described the incident to Officer Dugas.[3]  Officer Dugas stated that she was told, "There's a gun [*sic*] in my baby's momma's apartment with a gun. He pointed at me. I thought he was going to shoot me cause he chocked the trigger and he broke in."[4]

As the officers entered the breezeway leading to apartment 721 with their weapons drawn, they heard loud talking and a disturbance between a male and female.  Following the voices, as the officers turned the corner they were faced with Mason and Babino standing in the apartment doorway rather than inside the

---

[3] Paul Pitkins, Richardson's cousin and the father of Babino's child, was also in the apartment at the time the incident occurred.

[4] Richardson's statement indicated that before Mason entered the bedroom he heard Mason say "I'm just going to pistol whip the shit out of you" and then heard him cock a gun. After Mason entered the bedroom, he was holding a gun in his hand and began pointing it at the ceiling and then put it down.  It was at that time Richardson and his cousin left the room.  *R. 44, Exh. B.*  Pitkin's statement confirmed that of Richardson.  *Id.*

apartment. Upon seeing the two, Officer Faul stated "What's going on?" and moved over so Officers Dugas and Galland could talk to Mason. Dugas and Galland began giving commands of "let me see your hands," "keep your hands in the air" and "put your hands in the air." As Mason was exiting the doorway, Officer Galland saw the rear sight post of a black pistol on the right side of Mason's waist band – where his black sweater was curled up. Mason initially raised his hands but then lowered his right hand down to his hip. The Officers began ordering Mason to "get on the ground." Mason did not comply with the orders and instead turned with his right hand to the wall and his back to Dugas and Galland facing Officer Faul. Faul stated that Mason "turns sideways ... and he squares up with me and he tucks his chin down and you know he got that weird look to his face," which made Faul think Mason was going to fight him. Faul saw Mason's hand start to come up with his elbow cocked out and then saw "a black gun stuck in his waist on the side." Mason yelled "Gun" and released the dog. Faul stated that when he saw Mason's hand cupped to grab the gun he started shooting at Mason.

Officer Faul continued to fire his gun because Mason's hand was still "where the gun was." After several shots, Mason remained on his feet hunching over and Faul stopped shooting when the dog started pulling him down. When Mason was on the ground face down, he moved his elbow "like to come up" – "like he wanted [sic]

4

spin over." His hand was underneath him where the gun was. Because Faul believed Mason was going to roll over and pull his gun he shot two more times and Mason stopped moving.

The Police Department Dispatcher's audio recording, *R. 44, Exh. A*, provides that the officers arrived on the scene at 9:25 p.m. and shots were reported being fired at 9:27. LCG Police Department personnel stated that first aid was initiated and requested Acadian Ambulance at 9:28. At 9:30, the Dispatcher asked if Acadian Ambulance was still needed, and if the scene was safe. An officer advised Dispatch that Acadian was needed and requested that the ambulance go to the scene. At 9:35, an officer again asked for Acadian Ambulance. At 9:36, the Dispatcher advised officers on the scene that Acadian Ambulance would arrive at the scene in 7 minutes. At 9:48, an officer confirmed that Acadian Ambulance was on the scene to render assistance to Mason.

It is undisputed that before Acadian Ambulance arrived at the scene, LCG Police Department personnel moved Mason from the doorway of the apartment to the breezeway in order to administer aid to Mason. *R. 44, Exh.B, Affidavit of Arwood and Exh. A (attached disc).* LCG Police Department personnel,[5] along with an Army

---

[5] Officer Bart Ryder stated that he retrieved his medical pouch and began to render aid before the two medics arrived. Thereafter, Officer Joel Grayson brought his paramedic bag with additional supplies. They attempted to stop Mason's bleeding and performed "rescue breathes."

Combat Medic and a civilian Medic, performed resuscitation efforts on Mason. *Id.,
Statements of Nathaniel Paul and Gordon Rechaygl*. As stated on the Dispatcher's
recording, LCG Police Department personnel continued to check on the status of
Acadian Ambulance until the Ambulance personnel arrived – less than 20 minutes
after the initial call for medical aid. Mason died from his injuries at the scene.

The incident was investigated by Louisiana State Police and LCG Police
Department, and was submitted to a Grand Jury by the Lafayette Parish District
Attorney's Office, wherein the Grand Jury returned a "no true bill." *R. 44, Exhs. B,
F, J.* Plaintiffs' filed this action on November 20, 2012.

## II. Summary Judgment Standard

In evaluating a motion for summary judgment, the court must resolve all
disputed facts and construe all reasonable inferences in favor of the nonmovant. *Hill
v. Carroll County, Miss.*, 587 F.3d 230, 233 (5th Cir.2009). Summary judgment must
be granted if "there is no genuine issue as to any material fact and [the court finds]
that the movant is entitled to judgment as a matter of law." *Id.* (quoting Fed. R. Civ.
P. 56(c)). "No genuine issue as to any material fact exists where a party 'fails to make
a showing sufficient to establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at trial.' " *Id.* at 233–34.

---

*R. 44, Exh. B.*

6

In other words, the "nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In re Municipal Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir.1982). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see also Union Planters Nat'l Leasing v. Woods*, 687 F.2d 117 (5th Cir.1982).

### III. Analysis

Plaintiffs allege that defendants, LCG, Chief Craft and Officer Martin Faul violated  42 U.S.C. §§ 1983 and 1988,[6] the Fourth, Fifth, Eighth, and Fourteenth Amendments and state law tort and constitutional violations. *R. 1.* Plaintiffs further allege they are entitled to punitive damages and attorneys' fees against Officer Martin Faul, individually. *R. 15.*

Defendants deny that they are guilty of any violation of the plaintiffs'

---

[6] There is no cause of action for violation of 42 U.S.C. § 1988.  Rather, the statute provides that, in a federal civil rights action, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ..." *See* 42 U.S.C. § 1988(b).

constitutional rights and contend that all defendants acted reasonably and in good faith as to each and every act or omission alleged by the plaintiffs. Officer Faul contends he is entitled to qualified immunity from suit and liability in his individual capacity. Defendants further contend that any action and/or inaction alleged by the plaintiffs did not amount to deliberate indifference an/or reckless disregard or conduct so arbitrary as to "shock the conscience" – necessary proof to establish a Fourth or Fourteenth Amendment due process violation, nor was excessive force used, in violation of the Fourth Amendment. Chief Craft and LCG assert that vicarious liability is not available under § 1983, that plaintiffs' claims for failure to train fail and *Monell* liability cannot exist as there was no constitutional violation and that no official policy, custom or practice existed which caused any alleged violation of plaintiffs' constitutional rights. Defendants assert that plaintiffs' claims are without merit and should be dismissed, and defendants are entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.

*42 U.S.C. § 1983 Claims*

To state a claim under § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Moore v. Willis Independent School District*, 233 F.3d 871, 874 (5th Cir.2000). "A plaintiff must establish that the defendant was either personally involved in the

8

deprivation or that his wrongful actions were causally connected to the deprivation."

*James v. Texas Collin County*, 535 F.3d 365, 373 (5th Cir.2008). Claims under §

1983 may be brought against persons in their individual or official capacities, or

against a governmental entity. *Goodman v. Harris County*, 571 F.3d 388, 395 (5th

Cir.2009). "Personal-capacity suits seek to impose liability upon a government

official as an individual while official-capacity suits 'generally represent only another

way of pleading an action against an entity of which an officer is an agent.' " *Id.*

(citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658,

690, n. 55 (1978)). In a personal-capacity suit, the individual defendant may assert

personal immunity defenses such as qualified immunity.

The doctrine of qualified immunity affords protection against individual

liability for civil damages to officials "insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have

known." *Pearson v. Callahan*, 555 U.S. 223 (2009). When a defendant invokes the

defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the

inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th

Cir.2002) (*en banc*). To discharge this burden, the plaintiff must satisfy a two-prong

test: (1) claim that the defendants committed a constitutional violation under current

law; and, (2) claim that defendants' actions were objectively unreasonable in light

of the law that was clearly established at the time of the actions about which he

9

complains. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 251–52 (5th Cir.2005). While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory. *Pearson v. Callahan*, 555 U.S. 223, 226 (2009)(overruling in part *Saucier v. Katz,* 533 U.S. 194 (2001)).

*A. Excessive Force*

The use of deadly force for apprehension is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Such deadly force violates the Fourth Amendment unless, "the officer has probable cause to believe that a criminal suspect poses a threat of serious physical harm to the officer or others." *Id.* at 11. To prove that Officer Faul violated Mason's Fourth Amendment right to be free from the use of excessive force, the plaintiffs must show: "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Rockwell v. Brown,* 664 F.3d 985, 991 (5th Cir. 2011). When examining whether the alleged excessiveness was clearly unreasonable, a court should consider, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S.

386, 396 (1989). The immediacy of the threat and the reasonableness of the use of force are contested in this case.

As in other Fourth Amendment contexts, the "reasonableness" inquiry is objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"An officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm to the officer or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir.2009). "The excessive force inquiry is confined to whether the [officer or another person] was in danger at the moment of the threat that resulted in the [officer's use of deadly force]." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir. 2001) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat

11

of physical harm.")).

In this case, the evidence, including the audio tapes of the 911 and Police Department Dispatchers, shows that when Officer Faul arrived at the scene he knew Mason was armed, was in the process of an "aggravated burglary" inside an apartment and had committed aggravated assault while inside the apartment.[7] The eyewitness accounts provide that upon rushing to the scene, Officer Faul was almost immediately within 10 feet of being face-to-face with Mason and a woman who appeared upset, in the doorway of the apartment. After initially complying with the officers' verbal commands to put his hands up, Mason's actions of turning toward Faul in a "stance" position and dropping his raised right hand toward his waist band where Faul saw Mason's gun located, transpired virtually simultaneously with Officer Faul's release of his canine and then firing his weapon. All of the officers and Babino confirmed that while being confronted by the officers, Mason never advised that he was in possession of a gun. *R. 44, Exh. B.*

Plaintiffs contend the reports of their experts, George L. Kirkham, pH D and Ronald R. Scott, suggest that Officer Faul and the other responding officers' actions prior to the moment of seizure "created" the need to use deadly force. The objective reasonableness standard is what controls in this case, however, not what the officers

---

[7] Assault is defined as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." La. R.S. 14:36 .

12

"could have done" better. Specifically, "The reasonableness of an officer's use of deadly force is [] determined by the existence of a credible, serious threat to the physical safety of the officer or to those in the vicinity. And, critically, reasonableness in these circumstances "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)." *Hathaway v. Bazany,* 507 F.3d 312, 320-321 (5th Cir. 2007).

In *Young v. City of Killeen*, the Fifth Circuit reversed the district court's ruling on summary judgment in which Dr. Kirkham stated opinions similar to his opinions in this case. *Id.,* 775 F.2d 1349, 1353 (5th Cir.1985). The district court's reasoning assumed that "the force would have been avoided if [the officer] had approached [the plaintiff] as required by proper police procedure." *Id.* at 1352. The Fifth Circuit rejected this analysis, holding that "[t]he constitutional right to be free from unreasonable seizure has never been equated by the court with the right to be free from a negligently executed stop or arrest." *Id.* at 1353. It concluded that, if the plaintiff's movements gave the officer cause to believe that there was a threat of serious physical harm, the officer's use of deadly force was not a constitutional violation. *Id.* "The only fault found against [the officer] was his negligence in creating a situation where the danger of such a mistake would exist. We hold that no

13

right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretation of his acts." *Id.*

Based on the evidence in the record, the totality of the circumstances in which Officer Faul found himself and the applicable jurisprudence, the Court finds that Mason "posed a threat so serious as to justify a reasonable officer in [Officers Faul's] position to respond with deadly force." *See Hathaway,* 507 F.3d at 321; *see also Rockwell v. Brown,* 664 F.3d 985, 992-993 (5th Cir. 2011).

## B. Due Process

Plaintiffs allege they suffered a violation of their constitutional rights under the Fourth and Fourteenth Amendments.[8] "[T]he substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 (1998). Negligence does not meet the "shock the conscience" standard; rather, "[i]t is, ..., behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking

---

[8] Plaintiffs also alleged a due process violation under the Fifth and Fourteenth Amendments. Such a claim applies only to due process rights involving Federal actors–which are not at issue in this action. Accordingly, the Court will not address plaintiffs' Fifth Amendment due process claim.

level." *Id.* at 849. Moreover, the parameters of what constitutes a violation of one's substantive due process rights is fluid and demands a case-by-case analysis of the facts. *Id.* ("Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.").

As a result, when officers are faced with dangerous situations in which split-second decisions must be made, the bar for demonstrating that certain behavior shocks the conscience is higher. *Id.* at 853. Where unforeseen circumstances demand instant judgment-when officers pursue a fleeing armed robbery suspect, for example-even deliberate indifference does not shock the conscience since decisions made in such circumstances are not deliberate. *Id.* at 851-53. Where instant judgment is required, only deliberate actions intended to harm another shock the conscience. *Id.* at 836.

Plaintiffs assert that Officer Faul's shooting Mason twice in the back while Mason was face down on the ground is an act that "shocks the conscience." Plaintiffs however, have failed to provide any evidence to support their contention that Officer Faul actions "were inspired by malice rather than merely careless or unwise excess of zeal." *Petta v. Rivera,* 143 F.3d 895, 911 (5th Cir.1998). According to the eyewitness accounts, at the time Faul fired his weapon the last two times, Mason still

15

had a gun in his pants' waistband on the right side and he appeared to be attempting to roll over onto his left side while his right hand remained near the gun. Faul's action was justifiable as he continued to perceive that Mason could retrieve his weapon and fire at Faul, the other officers and/or Babino. The evidence further indicates that as soon as Mason stopped moving, Faul stopped shooting.

*Deliberate Indifference*

The Due Process Clause of the Fourteenth Amendment protects an arrestee's right not to have his serious medical needs met with deliberate indifference on the part of arresting officers.[9] *See Hill v. Carroll County, Mississippi*, 587 F.3d 230, 237 (5th Cir.2009). "The Due Process Clause of the Fourteenth Amendment guarantees that a person detained by the police is entitled to medical care." *Carter v. Reach*, 399 Fed.Appx. 941, 942 (5th Cir.2010). "Officers violate that right if they are deliberately indifferent to a serious illness or injury. A showing of deliberate indifference requires a showing that the defendant subjectively knew of a substantial and significant risk and that he effectively disregards that risk." *Jacobs v. West Feliciana Sheriff's Dept.*, 228 F.3d 388, 395 (5th Cir.2000).

A government official's knowledge of a substantial risk of harm may be inferred if the risk was obvious. *Gonzales*, 436 F.3d at 573. The determination of the

---

[9] The subjective deliberate indifference standard applies to convicted inmates under the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 648 (5th Cir.1996).

16

objective reasonableness of particular conduct in light of the subjective deliberate indifference standard is a question of law for the court. *See Jacobs v. West Feliciana Sheriff's Department*, 228 F.3d 388, 394 (5th Cir.2000). The Fifth Circuit has explained that this standard requires the court "to determine whether, in light of the facts as viewed in the light most favorable to the plaintiff [ ], the conduct of the individual defendants was objectively unreasonable when applied against the deliberate indifference standard." *Id.*

To raise a genuine issue of material fact for trial, the plaintiff must present evidence from which a reasonable fact-finder could conclude that the defendant "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 755 (5th Cir.2001). Delay in providing medical care does not rise to the level of a constitutional violation unless the delay results in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir.1993).

In addition to the Police Department Dispatcher's audio recording indicating that Officer Faul called for Acadian Ambulance to come to the scene within a minute after he informed the Dispatcher that shots were fired, Officer Faul confirmed in his Interview that immediately after the shooting he made sure the apartment was cleared and then radioed the Police Department that the suspect was down and to send

Acadian Ambulance to the scene. Officer Galland stated that after clearing the apartment he found that Mason had been moved into the breeze way and Officer Dan Courville and a civilian were performing first aid on him. Officer Dugas confirmed that after the apartment was cleared, she saw officers attending to and bandaging Mason. Viewing the facts in the light most favorable to the plaintiffs, there is no evidence of deliberate indifference by denying or delaying medical treatment to Mason after the shooting.

*Monell Claims*

Plaintiffs allege that Officer Faul and Chief Craft are liable in their official capacities. A suit against a municipal official in his official capacity is tantamount to a suit against the municipality. *Hafer v. Melo,* 502 U.S. 21 (1991). The municipality may be held liable on account of the unconstitutional conduct by the official only if the entity's policy or custom played a part in the violation of the plaintiff's rights. *Id.*

Section 1983 offers no *respondeat superior* liability. Municipalities are not liable for the constitutional torts of their employees unless those employees act pursuant to official approval. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978) (reaffirming that "the doctrine of respondeat superior is not a basis for rendering municipalities liable under § 1983"). "Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by

18

municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) ("Culpability includes both the involvement of a municipal policymaker and affirmative municipal action.").

In order to assert a claim for municipal liability under § 1983, a plaintiff must establish three elements: (1) a policymaker, (2) an official policy or custom, and (3) a violation of a constitutional right the "moving force" of which is the official policy or custom. *Id.* An official policy is either:

> (1) A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or
>
> (2) A persistent, widespread practice of officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents the municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984) (*en banc*). Thus, *Monell* plaintiffs must establish both the causal link ("moving force") and the municipality's degree of culpability ("deliberate indifference" to federally protected rights). *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir.1998).

Plaintiffs allege that LCG and Chief Craft are liable for "failing to supervise and train their police officers; overlooking officer misconduct; and implicitly or

explicitly adopted and/or implemented careless and reckless policies, customs or practices." *R. 1, ¶ 25.* In their opposition memorandum, plaintiffs broadly state that "[t]he general orders of the Lafayette Police Department, the CALEA Standards upon which they are allegedly based and every national police standard across this nation reflects that the use of lethal force is only allowed when it is required to overcome the threat of life or serious injury being made ay a suspect." *R. 60, p. 10.* Plaintiffs refer, but provide no citations, to the opinions of their experts, George L. Kirkham, pH D and Ronald R. Scott, in support of their allegations that the officers' actions "precipitated" the need to use deadly force.

Kirkham suggests in his deposition that the officers should have: (1) taken the time to call a supervisor to come to the scene; (2) checked with the complainant regarding the facts of the situation; and, (3) devised a "tactical plan as far as what we're going to do" before responding to the call.     *R. 60-4, p. 74-75.* Kirkham conceded, however, that he had not read the statements of all the responding officers or listened to the audio recordings of the 911 and/or Police Department Dispatcher, and therefore was not aware of the officers knowledge before the incident occurred. Moreover, in his August 18, 2013 correspondence to plaintiffs' counsel, Kirkham acknowledged that the officers were responding to a *"potentially high-risk situation.", R.60-8.* Scott opined that because the officers did not maintain "cover and concealment" rather than placing themselves within 21 feet of the "danger zone,"

they may have made mistakes that led to the fatal shooting. *R. 44, Exh. M, p. 78.* Scott admitted that even if the 21-foot rule had been observed, and the suspect refused to comply with police commands and reached for a weapon in his waistband, as the facts in this case demonstrate, a "shoot" scenario would have occurred. *Id., pp. 79-80.*

A plaintiff must show more than that "an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct [because] ... [s]uch a claim could be made about almost any encounter resulting in injury ...." *City of Canton*, 489 at 391. Further, "plaintiffs must introduce more evidence than merely the opinion of an expert witness." *Snyder v. Trepagnier*, 142 F.3d 791, 799 (5th Cir. 1998).

Plaintiffs' further contend that Officer Faul violated a number of unspecified policies/practices when he released his canine. *Id.* The Lafayette Police Department Policy regarding "Utilization of Department Animals" states that canines shall respond to "Major disturbance calls" and "Calls where the presence of a canine may deter an attack on a police officer." *R. 44, Exh. D.* As the evidence supports, Officer Faul released his canine when he perceived that Mason was going to fight–before Mason lowered his right arm toward his gun. There is no evidence that LCG had a policy or custom of using canines in a manner that would cause a person, like Mason, to suffer a deprivation of his constitution rights. *See City of Oklahoma City v. Tuttle,*

471 U.S. 808, 824 (1985).

Finally, plaintiffs contend that Chief Craft "failed to sanction conduct that is outside the normal policies, procedures and protocols through re-training, sanction or other disciplinary means thereby constituting tacit approval of inappropriate conduct by the police in the use of lethal force."[10] Plaintiffs make the statement that during Chief Craft's 6 year term, "there have been approximately 12 shootings, 11 of which have been fatal." *Id. at p. 19.* Apparently in support of this statement, plaintiffs attached to their opposition memorandum unidentified internet printouts entitled "Arrest-Related Deaths, 2003-2009 - Statistical Tables" and "Uniform Crime Reporting Statistics - UCR Data Online." *R. 60-3; 60-10.* The exhibits provide no reference to the LCG Police Department and plaintiffs provide no explanation as to how they support their position.

Plaintiffs have produced no evidence to show a policy, custom or practice of any sort, therefore, plaintiffs' *Monell* claims must be dismissed.

*State Law Claims*

28 U.S.C. § 1367 confers supplemental jurisdiction over plaintiffs' state law claims. The Fifth Circuit has recognized that "[u]nder Louisiana law, we apply the same 'reasonableness' standard to ... state law claims of false arrest and excessive

---

[10] After in camera review, the Magistrate Judge assigned to this action ruled that the prior Internal Affairs and/or Louisiana State Police reports in other shootings involving the LCG are irrelevant. *R. 39.* Plaintiff did not object to the ruling.  The Magistrate Judge did order defendants to produce some of the files from the prior shootings in a redacted form pursuant to the Public Records Doctrine. *Id.*

force that we apply when analyzing whether qualified immunity shields [an officer against] federal constitutional claims." *Winston v. City of Shreveport,* 390 Fed. App'x 379, 385–86 (5th Cir. 2010) (citing *Reneau v. City of New Orleans,* 2004 WL 1497711, at \*3–\*4 (E.D.La. July 2, 2004) (Fallon, J.); *Kyle v. City of New Orleans,* 353 So.2d 969, 973 (La.1977) ("Whether the force used is reasonable depends upon the totality of the facts and circumstances in each case.). For the reasons discussed in the foregoing, Officer Faul's actions in this case were reasonable under the circumstances. Accordingly, the Court will grant summary judgment as to plaintiffs' pendent state law claims for direct and vicarious liability.

## *IV. Conclusion*

For the foregoing reasons, the Court will grant defendants' motion for summary judgment and dismiss plaintiffs' federal and state law claims with prejudice.

Richard T. Haik, Sr.