# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

| | |
|---|---|
| Brenda Mason, et al. | Civil Action No. 6:12-CV-2939 |
| versus | Judge Rebecca F. Doherty |
| Martin Faul, et al. | Magistrate Judge Carol B. Whitehurst |

## REPORT AND RECOMMENDATION

Pending before the Court, on referral from the district judge, is a request for determination of a qualified immunity issue which was remanded to this Court in the Fifth Circuit's Judgment.

### *I. Background*

On December 9, 2011, Officer Martin Faul fatally shot Quamaine Mason while responding to a reported armed robbery. Plaintiffs subsequently filed this action against Officer Faul, Lafayette City-Parish Consolidated Government ("LCG"), and Chief James P. Craft (collectively "Defendants"). Plaintiffs asserted claims against Officer Faul under the Fourth, Fifth, Eighth, and Fourteenth Amendments. They also asserted claims pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) against Officer Faul's employers, LCG and Chief Craft. Plaintiffs included state law claims against all three Defendants.

On December 10, 2013, the district court granted Defendants' motion for summary judgment and dismissed all of Plaintiffs' claims with prejudice. (Doc. 72.)

On appeal, however, the Fifth Circuit Court of Appeals reversed summary judgment as to Officer Faul on Plaintiffs' Fourth Amendment and related state law claims. *Mason v. Lafayette City-Parish Consolidated Gov't*, 806 F.3d 268, 277 (5th Cir. 2015). Specifically, the Fifth Circuit: (1) reversed the granting of qualified immunity in favor of Officer Faul with regard to the last two shots that he fired at Quamaine Mason; and (2) remanded the case to this Court for a ruling on whether Officer Faul is entitled to qualified immunity with respect to the first five shots fired at Quamaine Mason. *Id.* at 277, 282. The Fifth Circuit affirmed the district court's ruling in all other respects. *Id.* at 282.

On March 29, 2017, the undersigned conducted a telephone status conference to address the issues remaining after the Fifth Circuit's decision. (Doc. 95.) At that conference, the parties agreed that the matter is ripe for a ruling on the qualified immunity issue remanded from the Fifth Circuit, specifically, the issue of whether Officer Faul is entitled to qualified immunity on summary judgment as to the first five shots, with appropriate weight in the analysis to be given to the testimony of Rachel Babino.

## II. Law and Analysis

In the judgment rendered on appeal of this action, the Fifth Circuit advised "[w]hen addressing excessive-force claims, courts have an obligation to slosh our way through the fact bound morass of 'reasonableness.'" *Id. at 276.*

The Court noted that "the Supreme Court has recently emphasized that in an excessive-force case on summary judgment, like any other case, a court must accept as true the evidence of the nonmoving party and draw all justifiable inferences in that party's favor." *Id.* The Court observed that, in this case, "the district court failed to give credence to, or even make note of, Babino's conflicting account of the shooting which perhaps constitutes the Masons' strongest evidence." *Id*

Judge Higginbotham, concurring in part and dissenting in part, applied the appropriate standard and, accepting as Babino's testimony as true, recited the following narrative of events, which this Court adopts:

> On December 9, 2011, Officer Martin Faul—a canine officer—was working the night shift. Responding to a reported armed robbery at a department store, Officer Faul heard a report of another armed robbery at Racquel Babino's apartment complex. Officer Faul immediately "volunteered for the call." Arriving on the scene at the same time as two other officers, all three officers ran toward the apartment with guns drawn. When the other officers gained the lead, he quickly took charge, yelling, "Y'all behind the dog."
>
> The officers arrived at the apartment complex to see Quamaine Mason walking out the front door of an apartment with a young woman. Quamaine matched the description of the suspect, and the police call had stated that he was armed. When the officers saw him, he was not fleeing or threatening anyone; he was walking quietly out the front door with a female companion. The young woman with him, upon seeing the police officers with already-drawn weapons, immediately shouted out that Quamaine had done nothing wrong. Quamaine, who wanted to be a police officer and was actively applying to agencies in the area, had a gun on his waistband. He had a permit to carry this gun.

Quamaine stood still with his hands up and empty, complying with all police instructions. But holding his dog by its collar, Officer Faul and the dog charged Quamaine—the two were separated by less than the length of the dog's thirty-six-inch tether. Officer Faul shouted "Gun!," and launched the dog onto Quamaine. When the dog hit Quamaine, he began falling to the ground reflexively trying to fend off the attack with his hands. As Quamaine fell, Officer Faul began shooting him. Indeed, Officer Faul began firing nearly simultaneously with his deployment of the dog, which continued attacking throughout the shooting. This means that Officer Faul was firing at point-blank range and that the assault was of man and dog, not dog then man. Neither of the other two officers on the scene fired a single shot.

The autopsy confirms that the paths of the shots which hit Quamaine are explained only by his struggle with the dog as he falls to his left and to the ground. None of the seven shots hit Quamaine head-on, instead striking him in downward paths from the side and back. The closest to head-on is the shot which hit Quamaine's chin at a sharp downward angle, then traveled through his neck (never exiting his body) to his chest. Dr. Traylor, who gave a "plausible order of shots fired based on the [witness] statements," believed this shot was the first to hit. However, this account is contradicted by other evidence; indeed, Babino stated that she believed the first shot hit Quamaine's chest or shoulder rather than his chin. Whenever the chin shot struck, its downward trajectory can be explained only by Quamaine's struggle with the dog.

While the dog was on Quamaine, Officer Faul shot Quamaine seven times at point-blank range (recall that the dog was on a thirty-six-inch tether held by Officer Faul's left hand and his gun was being fired with his right). If Quamaine did move on the ground prior to Officer Faul firing the last two shots, it may have been due to the dog, which was still "tearing at" Quamaine's hip, "grabbing him and pulling him back." However, there is evidence that Quamaine did not move during the pause between the first five and the last two shots to hit him. Babino's deposition indicates that her attention was fixed on Quamaine throughout the shooting, and officer accounts provide further support—she was watching Quamaine.

4

> When asked if she saw Quamaine move once he was on the ground, she stated that he picked up his head, but she did not see him "move his body, the trunk of his body." She also stated that she did not see Quamaine make "any threatening action . . . towards anyone" once the apartment door opened or make "any effort whatsoever . . . to fight back against the police."

*Id.* at 289.

On direction from the Fifth Circuit, the undersigned must address whether, based on the above version of events, genuine issues of material fact exist as to whether or not Officer Faul is entitled to qualified immunity with regard to the first five shots fired upon Quamaine Mason. "Qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009)(quoting *Wallace v. County of Comal,* 400 F.3d 284, 289 (5th Cir. 2005)). A defendant's assertion of qualified immunity is analyzed under a two-pronged test: (1) whether the plaintiff has shown sufficient facts to "make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

When an officer uses force to make a "seizure," the Fifth Circuit instructs that a claim against the officer under the Fourth Amendment be analyzed for "objective

reasonableness." *Mason,* 806 F.3d at 275 (citing *Graham v. Connor,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To prevail on an excessive-force claim, a plaintiff must show "(1) an injury (2) which resulted from the use of force that was clearly excessive to the need and (3) the excessiveness of which was objectively unreasonable." *Id.* (citing *Rockwell v. Brown,* 664 F.3d 985, 991 (5th Cir. 2011)).

An officer's reasonableness in using force – deadly or non-deadly – is analyzed under an objective standard "in light of the facts and circumstances confronting [the officer], without regard to [his or her] underlying intent or motivation."*Id.* (citing *Graham,* 490 U.S. at 397). In determining an officer's reasonableness, courts are to pay "careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers and others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision hindsight," and "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97, 109 S.Ct. 1865. The inquiry is limited to whether the officer "was in danger at the

6

moment of the threat" that resulted in the use of force. *Mason,* 806 F.3d at 276 (citing *Rockwell v. Brown*, 664 F.3d 985, 001 (5th Cir. 2011).

Giving full credence to the testimony of Rachel Babino, the Court finds that a reasonable jury, considering the totality of circumstances and balancing the severity of the threat against the officers, could conclude that Mr. Mason, objectively posed no immediate threat, such that Officer Faul violated the Fourth Amendment in firing the first five shots. Although Officer Faul indicated that Mr. Mason's hand went toward the gun in his waistband before Faul released his canine, Ms. Babino's testimony contradicts Officer Faul's account. According to Ms. Babino, Mr. Mason made no threatening move toward the officers and stood still with his hands up, complying with police instructions. Ms. Babino claims that Officer Faul and his police dog simultaneously attacked Mr. Mason, Officer Faul shooting him seven times at point blank range as he fell down struggling to fend off the dog. Ms. Babino asserts that Mr. Mason only dropped hands to his crotch after the dog attacked him. She further asserts that Mr. Mason never did anything to require Officer Faul to release the dog for an attack, that Mr. Mason never touched the gun, and that Mr. Mason never attempted to resist, assault or fire upon the police.

With regard the second inquiry regarding qualified immunity – whether the violated constitutional right was clearly established at the time of the violation – "[i]t has long been clearly established that, absent any other justification for the use of

force, it is unreasonable for a police officer to use deadly force against a . . . felon who does not pose a sufficient threat of harm to the officer or others." *Lytle v. Bexar County,* 560 F.3d 404, 417 (5th Cir. 2009); *see also Graves v. Zachary,* 277 Fed. Appx. 344 (5th Cir. 2008)("It does not take a specific case for an officer to know that he cannot shoot a compliant suspect and that he cannot fire again at someone who is objectively 'downed or incapacitated.'"). Accordingly, this Court concludes that there are material fact questions as whether Officer Faul is entitled to qualified immunity regarding the first five shots fired at Mr. Mason. This issue is not appropriate for decision on summary judgment and is best left for the jury.

### *III. Conclusion*

Considering the foregoing, the undersigned recommends that the Court find that there are issues of fact precluding summary judgment in favor of Faul on the basis of qualified immunity as to the first five shots, and DENY the Motion For Summary Judgment filed by Martin Faul on the Mason's Fourth Amendment and state law claims.[1] [Rec. Doc. 44].

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

---

[1] The parties agree that the Fourth Amendment's reasonableness standard applies to the state-law claims, such that the state-law claims rise or fall with the Fourth Amendment claim. *Mason*, 806 F.3d at 282.

being served with of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir.1996).

THUS DONE AND SIGNED this 2nd day of May, 2017.

**CAROL B. WHITEHURST**
**UNITED STATES MAGISTRATE JUDGE**